**In re GIBSON HOTELS, Inc.**

No. 3344.

District Court, S. D. West Virginia.

Oct. 7, 1938.

860

Harry Scherr, of Huntington, W. Va., and R. E. Milling, Jr., of New Orleans, La. (Vinson, Thompson, Meek & Scherr, of Huntington, W. Va., and Milling, Godchaux, Saal & Milling, of New Orleans, La., of counsel), for debtor company.

Paul W. Scott and T. D. Wilson, of Huntington, W. Va., for respondents.

Bradley Walker, of Nashville, Tenn., for intervening creditors.

HARRY E. WATKINS, District Judge.

On October 15, 1937, Gibson Hotels, Inc., operating the Prichard Hotel in Huntington, W. Va., debtor in this proceeding, filed its petition for reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, alleging inability to pay its debts as they matured. With the petition, it filed a plan of reorganization, dated April 1, 1937, which debtor, prior to filing its petition, had submitted to all creditors to be affected thereby, and all stockholders. C. L. Ritter, J. T. McClintock and Don Ritter (hereafter referred to as "respondents"), holding an aggregate of $50,705 principal of debtor's outstanding $649,522.50 principal of first mortgage bonds, intervened, alleging insolvency of the debtor, and unfairness and want of feasibility of the plan. The question now before the Court is whether it should confirm the plan of reorganization as finally submitted.

In order to expedite the proceeding, a hearing was had upon the plan in open court. Prior to such hearing, interventions

were filed on behalf of George Peabody College for Teachers, Board of Finance of the Methodist Episcopal Church South, and 136 other creditors and bondholders who accepted the plan, holding in the aggregate in excess of $245,000 principal bonds, all actively supporting the plan.

At the time of the hearing, bondholders holding an aggregate of $548,497.50 principal of the $630,865.20 principal bonds, approved and allowed, had filed their written acceptances to the plan. Bonds with respect to which acceptances were filed comprised 84.44 per cent of all bonds outstanding. All other creditors affected, and all stockholders, accepted the plan. Only the respondents, holding 7.65 per cent of the outstanding bonds, objected to the plan.

The plan, as originally submitted, provided for the following:

1. Payment in cash of one-third of the accrued and unpaid interest on the present bonds for the period April 1, 1935, to April 1, 1937.

2. The issue to holders of present bonds, which mature October 1, 1946, and which bear interest at 5% per annum until April 1, 1939, and 5½% per annum thereafter, (a) new first mortgage 5% bonds maturing April 1, 1957, in an amount equivalent to 50% of the principal of the present bonds, and (b) new second mortgage non-cumulative 5% income bonds maturing April 1, 1962, in an amount equivalent to the remaining 50% of the present bonds.

3. Modification of the existing leases on the coffee shop and ball room, which expire October 1, 1961 (the present ball room lease being subject to cancellation at lessor's option after October 1, 1946), so as to reduce the present aggregate rental thereon from $400 per month (such rental increasing to $450 after October 1, 1946) to $250 per month for the balance of the term thereof, and to provide for cancellation of the two leases at the option of the lessors at the end of any third year period.

4. Amendment of the management contract with L. M. Gibson to extend it from October 1, 1941, to April 1, 1947, at a salary reduction from $9,000 to $6,000 a year with certain graduated increases dependent on retirement of indebtedness as set forth in Section 7 of the plan.

5. Execution of mortgages securing the new bond issues whereunder all permanent assets of the corporation and the life insurance policies will be mortgaged and every dollar of income resulting from the company's operations will be applied either for expenses of operation, maintenance or betterment of the mortgaged property or upon the indebtedness of the bonds, under provisions which will operate as follows:

When the mortgages are executed, debtor, after reserving $10,000 working capital, and after providing for a reserve for maintenance, repairs, replacements and renewals, computed from April 1, 1937, on the basis of $18,000 annually for such purposes, will deposit with first mortgage trustee all funds on hand not needed to pay one-third of the interest on the present bonds from October 1, 1935, to April 1, 1937, and not needed for costs, expenses, and allowances incident to the plan and the proceeding. Thereafter, quarterly, debtor, after making corresponding reserves, will deposit with the first mortgage trustee all funds derived from its operations, after payment of operating expenses. "Operating expenses" shall not, for such computation, include interest on second mortgage bonds, or depreciation or similar items. Annually, debtor will deposit with the first mortgage trustee any unexpended balance of funds so reserved by debtor for maintenance, repairs, replacements and renewals, and direct that such funds be applied similarly as funds deposited quarterly, or direct that such funds be held and accumulated (not beyond $50,000 at any time), in a special account, distinct from the other accounts hereafter mentioned, subject to debtor's right to make future use thereof in paying for maintenance, repairs, replacements, renewals, improvements, additions and betterments. The funds deposited initially and quarterly with first mortgage trustee shall be allocated by the first mortgage trustee in the following order:

(a) To a tax account for the payment of taxes on the mortgaged property;

(b) To an interest account for the payment of interest on the first mortgage bonds;

(c) Up to $50,000, to an account to be used prior to April 1, 1942, with the consent of the first mortgage trustee in paying for, or repaying amounts that may be borrowed by debtor for installing air-conditioning, making physical alterations, improvements or enlargements, in the mortgaged property, acquiring additional real estate or for first mortgage interest, maintenance, repairs, replacements and renewals, or other operating expenses;

(d) Up to $25,000, to an account to be used (without limitation as to time) for any of the purposes for which funds in the account under clause "(c)" might be used;

(e) To the extent necessary to reimburse the $50,000 account under clause "(c)" and the $25,000 account under clause "(d)", and in that order, for withdrawals made therefrom for interest, maintenance, repairs, replacements, renewals, or other operating expenses; and

(f) To a bond retirement account for the retirement of first mortgage bonds by purchase and cancellation on tenders at the lowest prices offered, not exceeding, however, par and accrued interest, or by redemption by lot at par and accrued interest.

After allocations to the bond retirement account shall have resulted in retiring first mortgage bonds in principal amount equal to a sum calculated at a rate of 5% per year for the period elapsed after April 1, 1937 to the end of the debtor's then current fiscal year upon the aggregate principal amount of first mortgage bonds issued, the allocations to such bond retirement account need not be more than sufficient to maintain, at all times, an aggregate retirement of outstanding first mortgage bonds calculated as above stated, and any excess of funds available from the debtor's operations, as long as all of the debtor's obligations under the first mortgage bonds and under the first mortgage are complied with, and as long as any of the second mortgage bonds remain unpaid, shall be deposited with the second mortgage trustee to be used in paying interest upon and retiring second mortgage bonds.

On April 1, 1942, any unapplied funds in the $50,000 account under clause "(c)" shall be transferred to the accounts mentioned under clauses "(d)" and "(f)", and in the order named, to the extent needed to meet then accrued requirements of such accounts, any balance to be used for second mortgage bonds. On or after April 1, 1952, any excess over $50,000, and, on or after April 1, 1957, any excess over $25,000, in the aggregate of funds in the account under clause "(d)" and the distinct account above mentioned created out of debtor's annual reserve for maintenance, repairs, replacements and renewals, shall be transferred out of such accounts and shall be applied similarly as would be applied then current earnings of debtor, first in fulfilling any then accrued requirements under the first mortgage, and then with respect to the second mortgage bonds.

All moneys applicable to second mortgage bonds under the above provisions will be applied by the second mortgage trustee as follows:

(a) One-half to pay, insofar as the amount permits, current interest on the second mortgage bonds not to exceed 5% per annum; and

(b) The balance to be applied in retirement of the second mortgage bonds by purchase and cancellation on tenders after advertisements at the lowest prices offered, not exceeding par or by redemption by lot.

Respondents objected to the plan for the following reasons:

"Point A. The said plan is not feasible in that it appears from the petition, plan and financial statement exhibited therewith and the financial experience of the debtor that it cannot be expected to pay from the earnings of the business the proposed annual curtailment or amortization of the first mortgage bonds, or any interest or curtailment of the proposed second mortgage bonds, under the provisions of the proposed plan;

"Point B. The proposed plan is unfair to the holder of the present bonds, because the proposals of the plan for the division of the present bonds into first and second mortgage bonds, with the accompanying provisions for interest and payment of principal of said issues and the reserves to be withheld by the debtor before special payments are made on principal and interest of the bonds, are unfair and inequitable, because proposed bonds of both issues in the light of the financial history of the company make no affirmative or realizable provision for establishment of sinking funds or amortization funds, for said bonds;

"Point C. The proposed plan provides no contribution by the company or its stockholders to the payment or eventual payment of the bonds, principal and interest;

"Point D. Because no provision is made for foreclosure in event of default so long as debtor applies earnings as provided in Section 4 of the plan to taxes, first mortgage interest and various funds;

"Point E. Because said plan is not certain and definite;

"Point F. The proposed plan is in other respects, the right to assign which hereafter is reserved, not feasible, and is unfair to the bondholders."

Subsequently (April 19, and October 7, 1938), amendments were filed to the original plan, as follows: (a) Two-thirds of the accrued interest on the present bonds, instead of being released, would be added to the second mortgage bonds. (b) The $25,000 specific reserve was eliminated. (c) Provision was inserted requiring retirements of first mortgage bonds (with provision for default and foreclosure in the event of failure to meet the requirements), as follows: Five per cent on or before October 1, 1942; an additional 10% on or before April 1, 1945; an additional 10% on or before April 1, 1947; and an additional 5% on or before the 1st day of April of each year thereafter, until April 1, 1957, the maturity date of the first mortgage bonds, when all remaining first mortgage bonds would become due and payable. These amendments were accepted by all of the stockholders, the only persons whose interests were adversely affected by the amendments.

Respondents' answer alleged that debtor was insolvent, but they have evidently abandoned this issue for the reason that they offered no evidence thereon and have not urged insolvency in either their oral argument or their written briefs.

■ Section 1 (15) of the Bankruptcy Act, 11 U.S.C.A. § 1 (15), provides that "a person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property * * * shall not, at a fair valuation, be sufficient in amount to pay his debts". The "fair valuation" contemplated by the statute is not the value at which such assets could be converted into cash on a distressed market or at forced sale, but is the value of the assets taken in their relationship to the business of the hotel as a going concern. In re Bucyrus Road Machinery Co., 6 Cir., 10 F.2d 333; In re Nathanson Bros. Co., 6 Cir., 64 F.2d 912. To apply this test of value to a hotel property, it is necessary to take into consideration all of the elements entering into the intrinsic, as well as the selling value of the real estate, and also the earning power of the property. In re Cleveland Discount Co., D.C., 9 F.2d 97; In re Reading Hotel Corporation, D.C., 10 F.Supp. 470. When this is done, the evidence shows conclusively that debtor is solvent.

Respondents' Objection A goes to the feasibility of the plan, and amounts to a contention that the earnings of the debtor's business will not produce sufficient income to take care of the new securities issued under the plan. In order to arrive at the income which may reasonably be expected from this hotel in the future, it is necessary to look to its past record. The Prichard Hotel was finished and began to operate about July 19, 1925. From the date of opening up to 1928, it was operated by one Kelly, and from 1928 to May, 1930, by the Dinkler Corporation. In May, 1930, L. M. Gibson, the present manager, took over the operation of the building as representative of the old bondholders committee of the old Prichard Hotel Corporation. Subsequently, in 1931, the Gibson Hotels, Inc., under the management of Gibson, acquired the property, and it was operated under his management up to October, 1937, at the time these proceedings were instituted. The common stock is owned by Gibson and members of his family. No preferred stock is outstanding. For the first three years of the operation of the hotel, its gross income was slightly less than $300,000 annually. Thereafter, the gross income shrunk to a depression low of $131,469.41 for the fiscal year ending September 30, 1933, and from that point has been gradually increasing; and for the fiscal year ending September 30, 1937, was $194,678.70. Based on all available data, the average yearly gross operating income of the hotel for all years is $211,650.27. For the purpose of calculating future income, debtor has taken the results of the operation of the fiscal year ending September 30, 1931, in which year the gross operating income was $218,204.46, as the year most closely approximating the average, and as the typical year. The net operating income for that year was $49,-697.47, and debtor uses this figure in calculating prospective future income.

The respondents object to this basis of calculation and urge that the average net income since 1930 only, amounting to $30,-839.91, should be the basis for figuring prospective future earnings. The debtor says it is unfair to consider only the earning experience of the hotel for those years beginning with the deepest of depression years and running through that period. The debtor produced figures to show that for the last nine months of the Dinkler operation ending in May, 1930, the total income was $198,289.21 and the operating profit was $15,387.22, a ratio of 7.76%; and that for the same nine months under the Gibson management in the following year, notwithstanding a decline in gross income to $165,-

096.10, the operating profit was $40,171.04, a ratio of 24.33%. On the basis of these figures the debtor says that under Gibson's management the hotel is capable of producing a greater proportion of net operating income from gross operating profits than would be indicated by averaging the net operating income figures for the entire period of the hotel's operations; that such an average would fail to give proper effect to the more efficient management that the hotel has experienced under Gibson.

■ There is merit and objection to both means of calculation, and it is proper to consider them both in determining the prospective future earnings of the hotel. When this is done, and when further consideration is given to all other evidence in the case, it is reasonable to expect an average future annual income from this property after payment of operating expenses and maintenance, but before bond interest, depreciation and retirement of indebtedness of $49,677.47, the figure upon which all of debtor's studies and calculations are based.

Abundant evidence describing business in Huntington, and hotel business in particular, as abnormally low during the past few years, and foretelling improved economic conditions for the future is uncontradicted. There is no dispute in the evidence but that the Prichard Hotel is now one of the leading hotels of West Virginia. A witness for respondent indicates that for a period of at least 33 years from now the Prichard Hotel will be a money-making proposition. The present manager, Gibson, is capable and experienced. During the past year he has served as a trustee of this court and the results accomplished, as reflected in the money made for bondholders, are most encouraging. In 1937 the hotel earned $36,353.73, and spent at least $5,000 more for maintenance than in the average year. In the case of In re Pittsburgh Hotels Corporation, D.C.W.D.Pa. Nov. 1936, 17 F.Supp. 949, the appraisal company and the court, based on evidence of improved economic conditions, took as the basis for projecting future income available for distribution, a figure three times as much as had been earned by the William Penn Hotel during the year preceding the filing of the reorganization proceedings.

■ Based on this $49,677.47 expected future annual income available for interest, depreciation and indebtedness, all interest and all reductions of principal required by the plan could be paid, and it is entirely possible that the entire bond issues could be liquidated by maturity date. But in order for a reorganization plan to be feasible, it is not necessary that there should be some guarantee that the creditors will be paid in full, without question, within a specified period. Nothing in the statute requires such a guarantee. In re New Rochelle Coal & Lumber Co., 2 Cir.1935, 77 F.2d 881. There is no merit in respondents' Objection A.

■ Objection B claims unfairness in dividing the present bonds into two new issues. The answer to this objection is that all bondholders are treated alike. Those who get first mortgage bonds also get their share of second mortgage bonds. This procedure is not novel, and is entirely fair. A similar plan was approved In re Georgian Hotel Corporation, 7 Cir., 82 F.2d 917. Likewise there is nothing unfair in this plan wherein it creates a fund or reserve to take care of air-conditioning and other such improvements. The evidence shows that this competitive condition will likely arise within the next few years and that such expenditure will be necessary for the successful operation of the business. If no provision is made in the plan for this improvement, and it becomes necessary to expend $50,000 for air-conditioning to meet competition, there would be no funds available for that purpose, and a great loss would result to bondholders. If a plan is to be adopted, it must now make provision for meeting such problems as may reasonably be expected to arise in the near future. This reserve is placed in the hands of the trustee for bondholders, always subject to their lien, and cannot be used except with consent of such trustee. Any part of the fund not used by April 1, 1942, is then applied as other income. For the same reasons, the reserve relating to the $18,000 annual maintenance fund is fair and reasonable.

The plan is not unfair in making no affirmative provision for a sinking fund because under the plan every dollar derived from the operation of the property must be applied either to necessary expense of operations, retirement of bond indebtedness, or be turned over to the trustees of the mortgages, to become subject to their liens and to be used only on the conditions and for the purposes therein expressed.

■■ Objection C is to the effect that the plan is unfair because it requires no contribution from stockholders. If the debtor

is solvent, a plan may be fair even though the stockholders of debtor make no actual contribution. Here the debtor is solvent and Gibson, the manager, voluntarily relinquishes $3,000 annually of a salary due him under a managerial contract. To that extent there is an actual stockholder contribution.

■ As to Objection D, it may be said that provision has been made by amendment to the plan requiring debtor to make certain specified curtailments of bond principal. The deed of trust or mortgage must be approved by the court and appropriate provisions will be inserted for foreclosure in event of any default. The plan seems reasonably certain and definite and the court can see no merit in Objection E.

■ Respondents further complain of the provision in the second mortgage bonds which makes the interest non-cumulative and payable only out of available earnings. But a plan is not unfair merely because it contains provision for income bonds. In the Georgian Hotel Case, supra, income bonds, to the extent of 50% of the old first mortgage, cumulative to the extent of 2% per annum for the first five years and cumulative to the extent of 5% per annum thereafter, were given to the old first mortgage bondholders. In many cases it is most desirable and advantageous to all parties to issue income bonds in reorganizations. In the Georgian Hotel Case, supra, the court approved the case of Warner Bros. Pictures v. Lawton Byrne-Bruner Ins. A. Co., 8 Cir., 79 F.2d 804, 818, saying [page 919], " * * * the evident purpose of making the bonds income bonds is to remove the very menace of fixed charges which occasioned the difficulties of the business resulting in reorganization".

■ Fair consideration of respondents' objections to the plan require close examination of their exact position in this case. "Careful scrutiny * * * as to reasons of other than legitimate business character in which objections to the proposed plan appear to be grounded is always proper * * *." Downtown Investment Ass'n. v. Boston Met. Bldgs., Inc., 1 Cir., 81 F.2d 314, 324; In re Baldwin Locomotive Works, D.C., 21 F.Supp. 94.

Respondents purchased their bonds during the period from August, 1936, to March, 1937. (The plan of reorganization is dated April 1, 1937 and was submitted to creditors shortly thereafter.) Their bonds were purchased after default at prices of 37½ to 40 cents on the dollar. Respondents are successful business men of mature judgment. C. L. Ritter, one of respondents, holds 25% of the common stock, and his family holds 20% of the common stock, in a company which owns the Frederick Hotel in Huntington, a competitor of the Prichard. The Frederick Hotel was leased early in 1937 for five years with a five-year renewal option, to American Hotels Corporation. Hockenbury, vice president of American Hotels Corporation, produced as a witness for respondents, testified that, at the suggestion of Ritter and McClintock, he was making a proposition for his company to take over the operation of the Prichard Hotel. Ritter and McClintock, not only endorsed this proposal, but offered and filed in this proceeding their written agreement to underwrite Hockenbury's proposal, if for any reason, his company did not carry it out. The Hockenbury proposal was not offered as a plan at the hearing on April 19, 1938, but was offered in evidence only as bearing on the fairness of the plan under consideration. An examination of the proposal submitted in writing, however, disclosed that, not the American Hotels Corporation, but a new corporation, with a capital of $25,000, was to be incorporated to operate the hotel. All of the assets of the debtor company of almost a million dollars were to be transferred immediately to the new company. All of the stock of the new company would be issued to Hockenbury's company or to Ritter and McClintock for $25,000, but $15,000 of accumulated funds on hand would be paid now to the new company. Instead of paying the principal of all bonds in full, as contemplated by the plan under consideration, the Hockenbury proposal would reduce the principal claim of bondholders to $62.50 for each one-hundred-dollar bond held.

Instead of paying off the bonds and retiring them, they would be purchased by the new company and held as treasury bonds. Instead of contemplating payment and retirement in full of principal in 25 years, the Hockenbury plan would provide for purchase at $62.50 of all bonds in 33⅓ years. No bonds would be retired and cancelled such as to enhance the security of remaining bondholders. Profits are contemplated which would be withheld from bondholders, whereas the plan under consideration would require every dollar derived from operations to go toward discharge of every dol-

lar of indebtedness. The Hockenbury proposal would place the destiny of the Prichard Hotel in the hands of those vitally interested in the Frederick, a competing hotel.

■ Hockenbury's testimony and his willingness to take over the Prichard Hotel for 33⅓ years, and respondents' offer to underwrite the whole proposition, is of interest in considering the greater value and possibilities of the Prichard as compared to the Frederick. Respondents' unexplained willingness to underwrite a proposition so large indicates a desire on their part to enter into a business transaction that might be advantageous to them, but which could not be consummated if the will of the 84.4% of the remaining bondholders is affected by the approval of the plan. It is difficult to understand how any bondholder could be so enthusiastic over the Hockenbury proposal and yet say the proposed plan of reorganization is unfair. Any bondholder in this proceeding is within his rights in taking a position which he regards in line with his business interests. However, where the position taken, and the surrounding circumstances indicate, that his business interests can be different from the interest of his co-creditors as a class, the objections urged by such bondholders should, as against the wishes of an overwhelming majority of all bondholders, have little weight.

■ On October 7, 1938, more than three months after this case had been submitted to the Court for decision, respondents filed their petition and motion asking, for the first time, that this same Hockenbury proposal be filed and approved as a plan of reorganization under Chapter 10 of the Chandler Act, 11 U.S.C.A. § 501 et seq. If not filed and approved as a plan under the Chandler Act, they asked that it be filed as "alterations, modifications and changes" to debtor's plan under Section 77-B (f), 11 U.S.C.A. § 207(f); that a time be fixed and notice given for a hearing thereon and that action be deferred on debtor's plan pending such hearing. I cannot now grant any of these requests.

The Chandler Act, Chapter 10, Section 276(c), 11 U.S.C.A. § 676(c), provides as follows: "Provisions of sec. 77-A and 77-B [sections 206 and 207 of chapter 8, as amended, of this title], shall continue in full force and effect with respect to proceedings pending under those sections upon the effective date of this amendatory Act, except that * * *; (2) if the petition in such proceedings was approved more than three months before the effective date of this amendatory Act, the provisions of this chapter shall apply to such proceedings to the extent that the judge shall deem their application practicable."

The effective date of the Chandler Act was September 22, 1938. Debtor's petition was approved October 19, 1937, at which time the respondents appeared, and they have been through every step of this proceeding since that date. Hearing was had on debtor's plan on April 19, 1938, and at that time this identical Hockenbury plan was advanced by respondents and fully developed in the evidence. It was not offered as a plan but only as evidence of the feasibility of debtor's plan. It has been argued orally and in written brief by respondents. This proceeding was submitted for decision on June 28, 1938. Everything has been done under 77-B except the decision of the court. Under these circumstances, it is neither fair nor practicable to apply the new amendment and permit respondents to further delay this reorganization by now filing a plan which could not be filed under 77-B. Furthermore, there is every reason to believe that if respondents were able to secure the approval of the required percentage of bondholders to the Hockenbury plan, it would have been filed as a plan before this date.

The Hockenbury proposal is not a change or modification of debtor's plan, but is a completely different plan, as diverse as two plans could possibly be. To permit this completely different plan to be filed as a change or modification would be to do indirectly what other provisions of 77-B expressly forbid.

While this plan of reorganization is submitted by the debtor, it was conceived and prepared by creditors holding large blocks of bonds—creditors who are entirely familiar with the property and Gibson's management, and who purchased their bonds many years ago, before default, and before the market value became so low. A total of 84.4% of all bondholders, the stockholders and all other interested parties, except respondents, have approved the plan.

■ In passing upon feasibility of a reorganization plan a court should not lightly set aside express preference of a large percentage of all claims or interested security holders, especially if well considered and

apparently intelligently reached. In re A. C. Hotel Co., 7 Cir., 93 F.2d 841.

Debtor's plan should be modified by providing that the individual trustees under the first and second mortgages are to be selected by the Court, and that the consent of both trustees is required to expend any of the reserved funds. Such modification is not such a material amendment adversely affecting the interest of any party as to require it to be resubmitted for approval. With this modification, debtor's plan, as amended, is fair and feasible, and an order may be entered approving same.