**In re DOVER BOILER WORKS, Inc.**

District Court, D. New Jersey.
April 22, 1941.

Bilder, Bilder & Kaufman, and Nathan Bilder, all of Newark, N. J., for debtor.

William A. Dolan, of Newton, N. J., and John W. Herman and Foster F. Birch, trustees.

William Harris, of Newark, N. J., for certain creditors.

Jerome Alper & Alper, and Jerome Alper, all of Newark, N. J., for certain creditors.

Charles M. Phillips, U. S. Atty., of Newark, N. J., and Charles A. Stanziale, Asst. U. S. Atty., of Trenton, N. J., for the United States.

WALKER, District Judge.

The petition of the debtor [1] seeks reorganization in accordance with the provisions of Chapter X.[2] It shows an indebtedness liquidated as to amount and not contingent as to liability on May 6, 1940, of approximately $171,096.78.[3] The Court appointed a disinterested trustee and for the purposes specified in Section 189,[4] it appointed a representative of the creditors and an officer of the debtor as additional trustees.

A proposed plan of reorganization has been filed. Hearings have been held, during which the court, in order to acquire the necessary "informed, independent judgment"[5], appointed Joseph P. Day, Inc., and Louis J. Land, appraisers of the real and personal property.

The appraisal shows:

Real Estate

| | Going Concern Value | Forced Liquidation Value |
|---|---|---|
| Land and Buildings | $34,500.00 [6] | $31,500.00 [7] |

Certain Personal Property

| | Going Concern Value | Forced Liquidation Value |
|---|---|---|
| Machinery, Tools and Factory equipment including Cranes | $132,475.00 | $55,046.00 |
| Raw, semi-finished and finished steel | 20,995.00 | 10,250.00 |
| Motor trucks | 12,000.00 | 3,950.00 |
| | $165,470.00 | $69,246.00 |

The certified public accountant appointed by the court, the accountant in the employ of the debtor and certain officials and employees of the debtor furnish the following:

Balance of Personal Property

| | | |
|---|---|---|
| Cash on hand and in bank | $ 3,535.54 | |
| Petty Cash Fund | 1,300.00 | |
| Payroll Reserve | 4,118.06 | $ 8,953.59 [8] |
| Accounts Receivable (2/28/41) | 72,263.02 | |
| Sales to March 24, 1941 | 23,512.63 | |
| | 95,775.65 | |
| Collections to March 24, 1941 | 39,013.46 | 56,762.19 |
| Notes receivable, Trade | | 133.00 |
| Accounts receivable in suit | | 8,081.84 |
| Total receivable | | 73,930.62 |
| Reserve for bad debts | | 10,783.92 |
| Net receivable | | 63,146.70 [9] |
| Securities cost $7,125.00—Nominal Value | | 100.00 |
| | | $63,246.70 |

The work in process on March 25, 1941, was all special order, and it represented approximately $40,000; however, if unfinished it would become scrap steel worth $4,866.27.[10] A recapitulation of the going concern value less a bad debt reserve of $10,783.92 gives us $303,216.70.[11] If we take the forced liquidation values of the real property, the aforesaid certain personal property, add them to the net receivables and give the work in process scrap value, we have $168,858.97.[11]

The liabilities total approximately $218,278.72 [12].

---

[1] Filed May 6, 1940, dated May 6, 1940.

[2] Bankruptcy Act of 1938, 11 U.S.C.A. §§ 501–676.

[3] Page 3 of Petition. See also Exhibit A (balance sheet dated March 31, 1940) attached to Petition. It shows current liabilities of $168,377.77.

[4] Bankruptcy Act 1938, 11 U.S.C.A. § 589.

[5] Consolidated Rock Products Co. v. Du Bois, March 3, 1941, 61 S.Ct. 675, 85 L. Ed. ——.

[6] Value of real estate if taken independently from the machinery, but with the machinery in place and in operation.

[7] Amount which should be realized from a well conducted sales campaign of not more than four months.

[8] Approximate at March 24, 1941.

[9] See Exhibit T–5 as of March 25, 1941.

[10] 364½ tons of steel at $20 per ton, less freight to Bethlehem at $2 a ton and $5 a ton to cut to furnace size. ($4,738.-50). 2½ tons of stainless steel at 4½¢ a lb. ($127.77).

[11] The claim of the debtor against William F. Birch for $221,560.39 has not been included among the assets of the company. Testimony was taken at one of the hearings and it discloses that the assets of William F. Birch are all subject to a claim of the United States Government, and it is improbable that the debtor will collect even an infinitesimal part of the amount due to it.

[12] March 10, 1941. See also Statement of Assets and Liabilities to February 28, 1941, filed March 28, 1941.

The two attorneys who appear for certain objecting creditors,[13] argue the proposed plan of reorganization should not be approved.

Corporate reorganizations as we now know them are of relatively recent origin, making their first appearance on our statute books in the year 1933.[14] However, the organization of corporations had been effected for many years prior to this time through the medium of the much abused equity receivership which made its debut in the latter part of the 19th Century.

In 1934 statutory regulation was made available to industrial corporation with the advent of the well known Section 77B, 11 U.S.C.A. § 207.[15]

Section 77B required the petition to state that the debtor was insolvent [16] or unable to meet its debts as they matured.[17] Chapter X [18] supersedes Section 77B and petitions filed in proceedings therein must allege that the debtor is insolvent or unable to pay its debts as they mature.[19] The draughtsmen of each act provided for insolvency in the bankruptcy or equity sense. The petition filed in this matter reads: "The debtor is unable to meet its debts as and when they mature." [20] Herein, relief is sought because of alleged insolvency in the equity sense.[21]

The proposed plan [22] does not divert any of the assets of the debtor to the stockholders but, this does not relieve the

exercise all the powers, not inconsistent with the provisions of this chapter, which a court of the United States would have if it had appointed a receiver in equity of the property of the debtor on the ground of insolvency or inability to meet its debts as they mature. July 1, 1898, c. 541, § 115, as added June 22, 1938, c. 575, § 1, 52 Stat. 884." 11 U.S.C.A. § 515.

[22] The plan as filed, provides for a new corporation to be formed. The authorized capital stock to consist of 4,000 shares of 7% cumulative preferred of the par value of $100 per share, preferred over the common to the extent of the par value thereof and accumulated dividends in the event of liquidation and distribution voluntary or involuntary, and 1,000 shares of common stock without nominal or par value. Each share of preferred and common to be entitled to one vote on each matter submitted to a vote at any meeting of stockholders, including the election of directors. Non-voting stock is prohibited and management is by a board of not less than 3 directors. In the event of default in the payment of dividends on the preferred stock, the holders of such stock as a class shall have the right to elect an additional member to the board.

1,000 shares of the authorized preferred to be issued to L. O. Koven & Bros., Inc., for $100,000 in cash and it will lend to or obtain for the corporation a loan of a sum of money, which together with its investment of $100,000 shall be sufficient to enable the corporation to make all of the cash payments required by the plan.

The claims of creditors are to be dealt with as follows:

(a) Administration expenses and costs incurred by trustees to be paid in cash within 21 days after confirmation.

(b) Claims entitled to priority under

13 (a) BY: William Harris, Esq.

| | |
|---|---|
| Edgecomb Steel Corp. | $1,609.50 |
| International Corp. | 2,586.80 |
| Grammer, Dempsey & Hudson | 813.53 |
| Joseph T. Ryerson & Son | 174.68 |
| John B. Astell | 2,134.04 |
| | $7,320.55 |

(b) BY: Messrs. Jerome Alper & Alper

| | |
|---|---|
| Alan Wood Steel Co. | $ 9,911.39 |
| Harrisburg Steel Corp. | 234.00 |
| Ingersoll Steel & Discount Div. Borg-Watson Corp. | 1,961.26 |
| | $12,106.65 |

14 Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, pertaining to the reorganization of Railroads. This was the first time Congress brought reorganization procedure within the scope of the Bankruptcy power.

15 This paragraph and the preceding paragraph with footnote #14 taken from The Chandler Act—Its Effect Upon the Law of Bankruptcy, Vincent L. Leibell, Jr., Fordham Law Review, Vol. IX, page 380 at 393.

16 Insolvency in the Bankruptcy sense: A corporation is insolvent "whenever the aggregate of [its] property * * * shall not at a fair valuation be sufficient in amount to pay [its] debts." Bankruptcy Act of 1938, § 1(19), 11 U.S.C.A. § 1(19).

17 Insolvency in the equity sense.

18 Bankruptcy Act of 1938, 11 U.S.C.A. § 501 et seq.

19 Section 130(1), Bankruptcy Act of 1938, 11 U.S.C.A. § 530(1).

20 Ninth Paragraph of petition filed May 6, 1940.

21 See: "Upon the approval of a petition, the court shall have and may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon it,

court from determining whether or not they are entitled to share therein.[23] The question whether or not they are takes on added importance, because even though at the time the petition was filed,[24] it was believed that the assets at fair valuation exceeded the amount of the debtor's indebtedness, there appears to be a present cogent reason why a majority of the stockholders would wish a record showing termination of all their interest. Brief reference thereto seems advisable.

The issued and outstanding capital stock of Dover Boiler Works is as follows:

| William F. Birch | 250 shares |
| Anna Pauline Birch | 4,100 " |
| William D. Birch | 100 " |
| David E. Beatty | 100 " |
| Foster F. Birch, 3rd | 100 " |
| | 4,650 shares |

William F. Birch was the sole proprietor of Dover Boiler Works some time; and after it was incorporated, he transferred to his wife 4,000 shares of the capital stock thereof and this stock and the stock registered in his name have been levied upon by the United States Government for alleged deficiencies, interest and penalties assessed against Mr. Birch, and more particularly determined in the opinion of the United States Board of Tax Appeals entered April 11, 1941. For fear that L. O. Koven & Brothers, Inc., and this court would innocently assist Mr. Birch if he hoped by reorganization to defeat the purposes of said levy, William F. Birch, Foster F. Birch, 3rd, and William F. Birch, Jr., were asked under oath if an agreement had been made or was contemplated whereby they would receive an interest in the new company. Following their denials of any such arrangement Mr. Koven testified under oath that L. O. Koven & Brothers, Inc., were making the proposal more particularly set forth in the plan, only for the purposes of their corporation, and while members of the Birch family might be employed by L. O. Koven Brothers, Inc., or the new corporation, they would be employees only, without stock or other interest at this or any future time. All of this testimony is received by the court as true and it is relied upon in reaching a conclusion herein.

We proceed to consider the value of the assets of the debtor, in order to determine whether the stockholders should be included in the plan.

Reorganization procedure does not seek to divide the proceeds of a liquidation of the assets of the debtor. Rather it preserves from destruction going concern values which are thus made available for the payment of claims against and interests in the debtor.[25] It avoids the consequences to debtors and creditors of foreclosures, liquidations, and forced sales with their drastic deflationary effects.[26] It is to be preferred unless the full going concern value may be preserved by a sale of the business for a full and adequate price.

Specifically the going concern value of the debtor is approximately $303,216.70 and on paper this means somewhere in the neighborhood of $84,937.98 less allowances, costs and disbursements for stockholders. But the proposed plan is not in the true sense of the word a reorganization, it is in fact a sale of a going concern to a corporation to be formed. The additional money does not come from stockholders but from

provision of Bankruptcy Act arising prior to inception of these proceedings to be paid in cash within said 21 days.

(c) Allowed or listed as fixed claims of unsecured creditors of debtor not in excess of $75 to be paid in cash within said 21 days.

(d) $25,000 claim of Rose Ferenz to be settled for $3,000 and the $3,000 to be paid in cash within said 21 days.

(e) All other allowed or fixed unsecured claims to be paid 25% in cash and the balance of 75% in bonds bearing 4% per annum (semi-annually) payable 15 years from date of confirmation and amortized 5% per annum secured by a mortgage constituting a first lien on the land and buildings acquired by the corporation from the debtor, pursuant to the plan. Each creditor shall have the option within a certain period to sell his bonds to Gustave H. Koven or his designee or designees, for a sum in cash, equal to 55% of the principal amount of said bond. If exercised, the creditor will receive 66¼% in full satisfaction of his claim.

[23] In re Philadelphia & Reading Coal & Iron Co., 3 Cir., 105 F.2d 357.

[24] Ninth paragraph of Petition, filed May 6, 1940.

[25] Plans of Corporate Reorganization. John Gerdes, Vol. 89 University of Pennsylvania Law Review, 39 at 46.

[26] Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L. Ed. 110.

persons who profess an independent interest.

Therefore, assuming the stockholders' equity in going concern value and their right to share therein, should the plan in question be approved even though said stockholders are excluded from the benefits thereof?

The trustees have been in possession and have operated the debtor since May, 1940; the only plan they have is the one proposed. Not one of the creditors or stockholders has come forward with a suggestion, a solution or additional monies. There was and there is a recognized shortage of working capital. Something must be done.

In a matter such as this, the court should concern itself, as the first order of business, with preserving the assets for distribution among the creditors. It is this obligation that causes it to consider a plan that does not recognize the equity which the estimated going concern value shows on paper for the benefit of stockholders; stockholders, who raise no objection to said plan but, instead, urge approval thereof. It is difficult to say that the lack of working capital leaves liquidation as the only alternative in the event the plan is not approved. However, it does seem reasonable to conclude that in all probability liquidation will be the eventuality. If it is, then the court should attempt to determine now and as best it can, the amount the stockholders will receive in liquidation. Valuations of businesses and securities are troublesome and in the present state of our knowledge, they cannot be mathematically exact. The representative of Joseph P. Day, Inc., testified that the lands and buildings should bring $31,500 if offered by a well conducted sales campaign lasting about four months, this sum, added to $165,470, the going concern value of motor trucks, raw, semi-finished and finished steel and machinery, tools, etc., plus net receivables of $63,146.70, the nominal sum of $100 for securities and scrap value for work in process of $4,866.27, gives us $265,082.97, as full going concern value of everything except the lands and buildings and work in process. Surely no one will deny that if the debtor is obliged to liquidate, the land and buildings and work in process will not bring going concern values. Further, the court has only to step a short distance into the vague realm which is known as the things which it may take judicial notice of, to find that net receivables, when liquidated, never bring a sum near their going concern value, and even allowing for the demand which the war has produced for many types of machinery and tools, it seems improbable that the full $165,470 would be realized. If this is so, what is a full and adequate price under the existing circumstances? The proponents of the plan argue that it provides for paying all claims in full, that is, the approximate sum of $218,278.27, plus administration expenses, costs and disbursements. Assuming that same would bring the total to $240,000, there still remains approximately $25,000 in paper equity, and it can be argued with force that at least that much will be lost by liquidating net receivables, and the machinery. This is really an economic problem which can be answered by those whose interests are involved. If the court denies approval holding that liquidation would bring $265,000 or approximately said sum and the stockholders have an interest, after which the matter is liquidated and the creditors are paid less than the full amount due them, it would be guilty of an error of judgment in a matter which should be left for determination by those who are in business and able to pass upon the economics of the situation. So, by what Mr. Justice Cardozo calls the subconscious forces,[27] it concludes that about $240,000 is the value of the assets, and this sum represents 100 cents on the dollar to each and every creditor after administration expenses, costs and allowances are paid, and very little if anything to stockholders. If any person in interest is of a different opinion, he will have plenty of opportunity to make said fact known when the plan comes before the court for confirmation.

Proceeding on the theory that under any and all circumstances, the creditors are entitled to and should receive 100 cents on the dollar, and that it is problematical whether or not any sum in excess of said requirements will be received for and on account of the interest of stockholders, we have a plan that provides for each creditor to receive 100 cents on the dollar unless the option is exercised, in which event 66¼% is due. The manner in which the payments are to be made and the fact that the bonds will total in the neighborhood of $80,000, are for a period of 15

---

[27] The Nature of the Judicial Process.

years, and are secured by a mortgage on property worth $31,500 or $34,500, only, may make the plan economically unwise, but, the court is not called upon to say that the plan is the best or fairest that could be drafted.[28] Its inquiry must direct it to ascertain whether or not the plan is fair and equitable, that is, does it observe the absolute priority theory?[29] The plan insofar as it goes, does observe the absolute priority theory and gives full effect to the rights and priorities in valuing the equity of each class of creditor. It is in this respect, fair and equitable within the fixed meaning which said words have acquired through judicial interpretations in the field of equity receivership reorganizations.[30]

The corporation on April 1, 1941, had $206,272 in unfilled orders and $48,261 in work in process. It made about $2,500 profit in 1937; lost $5,000 in 1938, lost about $15,000 in 1939, and lost about $30,000 from January to May, 1940. The trustees since their appointment have made a small profit. With the contemplated complete change in management and the improved business conditions, the new corporation should be able to pay the charges on account of interest and amortization on a decreasing scale from approximately $7,500 to zero over a period of 15 years. While it is impossible to say that the plan is feasible on the basis of average net annual income over ensuing years[31], it does appear that under improved conditions, with new management and considering the success of the trustees in making a profit for the balance of the year 1940, when the debtor prior to May, 1940, lost approximately $30,000 are sufficient reasons for this court to find that the plan is feasible.

This court does not intend to interpose its judgment as to the economic wisdom of the plan. It approves same as fair, equitable and feasible, leaving to the creditors and stockholders at the time of the hearing on confirmation, the question of the economic business wisdom of what is proposed.[32]

An order should be presented.

---

[28] In re Radio-Keith-Orpheum Corporation, 2 Cir., 106 F.2d 22, at page 26.

[29] Case v. Los Angeles Lumber Products Co., Ltd., supra.

[30] Chicago, R. I. & P. Railroad Co. v. Howard, 7 Wall. 392, 19 L.Ed. 117; Louisville Trust Co. v. Louisville, New Albany & Chicago Ry. Co., 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130; Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028; Case et al. v. Los Angeles Lumber Products Co. Ltd., supra.

[31] In re Gibson Hotels, Inc., D.C.S.D. W.Va., 24 F.Supp. 859.

[32] 10 Remington on Bankruptcy, page 474.