In re W. E. PARKS LUMBER COMPANY, INC., Debtor.

Bankruptcy No. 581–00265–M.

United States Bankruptcy Court,
W. D. Louisiana,
Monroe Division.

March 30, 1982.

John C. Anderson, Baton Rouge, La., and George C. Harrod, Jr., West Monroe, La., for trustee.

Joseph S. Cage, Jr., U. S. Atty., and L. H. Harris, Asst. U. S. Atty., and Claude Skelton, Asst. Regional Atty., U.S.D.A., for FmHA.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LeROY SMALLENBERGER, Bankruptcy Judge.

## INTRODUCTION

The trustee herein, through counsel, moved to confirm his First Amended Plan of Reorganization; this matter was brought on for hearing on December 29, 1981, at 10:00 o'clock a. m. The only written objection to confirmation was filed by Lloyd Love, on behalf of the debtor, as its attorney. At the hearing on December 29, 1981, the Court overruled and dismissed this objection, as being unmeritorious and not filed timely. However, the Court delayed the confirmation of the plan further in order to allow the Farmers Home Administration (hereinafter "FmHA") to determine whether or not they would ultimately vote for the plan before the Court.[1] This matter was to

---

1. No written objection was timely filed by the FmHA. The date for such was December 27,

come up for a hearing on January 13, 1982; but it was again delayed until January 27, 1982, due to inclement weather and to allow the trustee and his counsel to negotiate further in hopes of gaining the FmHA's approval of the plan. The plan was confirmed on January 27, 1982.[1A]

## HISTORY AND POSTURE OF REORGANIZATION PROCEEDING

The debtor began operations in 1953 and was operated by William E. Parks, its sole shareholder, until his death in 1978. The company's operations initially centered upon a sawmill in Newellton, Louisiana. The Newellton mill produced hardwood timber and was apparently operated very profitably for many years.

However, in 1972, the company determined to construct a new sawmill in Port Gibson, Louisiana. The new mill cost an extremely large amount of money and never was sufficiently productive to be successful. Due to a number of factors, including the inability of the debtor to gain access to standing timber rights in Mississippi at reasonable prices and certain engineering and design defects in the layout of the Port Gibson mill itself, this mill was never able to operate profitably. Furthermore, in constructing the mill, the debtor company was forced to expend substantial amounts of money; and by mid-1975, approximately $12,000,000.00 was owed to various creditors (and mostly to the FmHA).

In 1978, Mr. Parks died; and the company was left without any effective management for the most part. At this point in time, approximately $15,000,000.00 appeared to be owed by the company. There-

fore, a combination of the expansion, which caused the company to become heavily indebted, when coupled with the death of its principal executive, caused the company to be over-leveraged and without proper stewardship at the end of 1978. The lack of working capital, the high debt on the company, and the lack of effective management could have caused the company to come into receivership in late 1978; but it did not.

The company's problems were further exacerbated in the spring of 1979 when the underlying stockholders of the debtor sold all of the stock of the company to Mr. Ernesto Ancira of San Antonio, Texas. Ancira looted the company over the next two years, literally stripping it of all current assets and working capital. When Ancira began negotiations toward buying the company in late 1978, the financial statements indicated that the company had approximately $8,000,000.00 in "current assets."[2] By the time the trustee took over control of the company in the spring of 1981, it had been looted and "current assets"[3] were arguably less than $500,000.00. When the FmHA allowed Ancira to assume Parks, this was a questionable extension of credit to Ancira. Subsequently, the debtor defaulted on the loan; and the FmHA received information concerning the default and the looting by Ancira, but took no action to protect its debt or collateral through either foreclosure or receivership. The loan was in default for approximately *one year* or more before filing without any protective action being taken by the FmHA. Therefore, because of the lack of action by the FmHA, the company was "gutted" by Ancira and his associates over

---

1981. Mr. L. H. Harris, attorney for the FmHA, acknowledged that no objection had been filed at the hearing on December 29, 1981, stating that the FmHA's failure to vote for the plan acted as its objection. The only written objections by the FmHA were filed on or about January 13, 1982, which was not within the time fixed for such by this Court.

**1A.** The trustee proposed several modifications (some verbal and some in writing) to the plan on January 27. The Court held these modifications to be immaterial, and confirmed the

amended/modified plan. These modifications (as reduced to writing) and the plan in which they are incorporated (dated January 27, 1982) now constitute the "Trustee's Second Amended Plan of Reorganization", and this is the plan which the Court confirms.

**2.** "Current Assets" means cash or its equivalent(s).

**3.** *Id.*

the two years in which they controlled the company.[4]

Historically, the debtor corporation is the largest employer in Tensas Parish, Louisiana. This company's demise has a greater significance and aura than the normal company, since its cessation disrupts the lives and finances of this relatively small parish in northeast Louisiana. The parish is presently impoverished because of the financial recession under which our country is suffering; and the cessation of the operations of this business has far reaching effects on this parish and related outlying areas. The impact of its operations on the parish is critical, and the social and economic effects of the termination of this business would be very disfavorable on the surrounding economy and the residents of Tensas and contiguous parishes. There is no doubt that this is a matter of public concern for this area; and this Court has received letters from the Mayor of Newellton and various prominent businessmen in the area urging confirmation of the reorganization plan because of the disasterous effect that the continued cessation of operations and potential future dismantling of the business has and would have on the economy of this part of the State of Louisiana.

The trustee shut down the operations of the plant shortly before Christmas in December of 1981, pending confirmation of the plan to guard against any erosion of capital until the debtor can be recapitalized and replenished with working capital *via* consummation of the plan; and approximately 25 to 50 employees have been "laid off" work since filing. The concern over this proceeding has been expressed from many areas, and there is no doubt that this is a matter of public interest in the northeastern part of Louisiana. Any analysis of the plan must be made with these facts in mind.

## ANALYSIS OF CLASSIFICATION UNDER THE PLAN

The plan of reorganization basically classifies four interests: priority debts (Classes 1 and 2), secured debts (Class 3), unsecured debts (Class 4), and stock interests (Class 5).

At filing, the debt structure of the company (as classified under the trustee's plan) was as follows:

| | | | |
|---|---|---|---|
| 1. | Classes 1 and 2 (priority debts) | – | $ 340,322.00 |
| 2. | Class 3 (FmHA) | – | 18,257,871.00 [5] (approximately) |
| 3. | Class 4 (other creditors) | – | 274,519.00 [6] (approximately) |
| | TOTAL | – | $18,872,712.00 (approximately) |

Priority debts will be satisfied in full at, or shortly after, confirmation, *except* that tax claims will be paid over six years.

The Court has already determined that the corporation is insolvent; and therefore, stock interests are excluded from participating in the trustee's plan under the Rule of Absolute Priorities.

Because of the above, Classes 1 and 2 are deemed to be unimpaired under Section 1124 of the Bankruptcy Code and are deemed to accept the plan.

Conversely, Class 5 is impaired and to receive nothing; and therefore, under Section 1126(g), this class is deemed to have rejected the plan. However, under Section

4. The schedules filed by the debtor show liabilities of approximately $18,872,712 at filing. The disclosure statement filed by the trustee reflects assets of the company of only $5,290,000. The debtor is egregiously insolvent. The basic assets are:

| | | | | |
|---|---|---|---|---|
| 1. | Newellton Sawmill | - | $2,100,000 | (approximately) |
| 2. | Port Gibson Sawmill | - | 3,000,000 | (approximately) |
| 3. | Other assets | -- | 190,000 | (approximately) |
| 4. | Current assets | -- | | Included in Item No. 1 above |
| | | | $5,290,000 | |

*See, also,* notes two and three, *supra*, and the accompanying text.

5. Approximately $13,000,000 owed to the FmHA is unsecured (undersecured) and will be placed in Class 4 for treatment.

6. *But, see* footnote 6 above regarding the FmHA unsecured debt of $13,000,000.00 (approximately) which will be added (for purposes of "treatment," rather than voting) to this Class under the plan.

1129(b)(2)(C), this class is receiving "fair and equitable" treatment. As was stated in the legislative history:

> "Subparagraph (C) applies to a dissenting class of impaired interests. Such interests may include ... the interests of common or preferred stockholders in a corporation .... If the interests are 'under water' then they will be valueless and the plan may be confirmed notwithstanding the dissent of that class of interests even if the plan provides that the holders of such interests will not receive any property on account of such interests."

*See* Comments from Legislative History contained at pps. 529–60 of the *1979 Collier Pamphlet Addition of the Bankruptcy Code*, which recites this legislative history.

Thus, the primary concern relates to the classification and treatment of Classes 3 and 4, the secured and unsecured creditors. The only purported secured creditor dealt with under the plan is the FmHA, which is the only creditor in Class 3. The FmHA will retain its secured interest for the value of its collateral. This value will be determined by the Court after confirmation, with the FmHA retaining its lien for the value of its collateral, and with the unsecured (undersecured) portion of its debt being treated the same as Class 4 (all other unsecured claims). This is mandated by Sections 506(a) and 1122(a) of the Code.

As to all unsecured claims which are not classified in Classes 1–3, they will all be placed together and treated the same in Class 4.[7] They will receive all of the common stock of the reorganized corporation.

### ANALYSIS OF TREATMENT UNDER PLAN

■ As was stated above, Classes 1 and 2 are unimpaired; they will be paid in cash and in full at confirmation, or shortly thereafter; *except*, tax debts will be paid over six years as allowed under Section 1129(a)(9)(C). Therefore, Classes 1 and 2 are not impaired as defined in Section 1124 of the Bankruptcy Code; and because of this, they are deemed to have accepted the plan under Section 1126(f) of the Code. Hence, as required by Section 1129(a)(10), at least one class of claims is deemed to have accepted the trustee's plan.

■ As to Class 5, stockholders' rights are totally eradicated under the plan. As was discussed in the text above, analyzing classification of these interests, the corporation has been deemed to be insolvent; and therefore, the exclusion of this class' participation in the plan is permitted by law, since their claims are valueless. Under Section 1129(b)(2)(C) of the Act, the plan can be confirmed over the dissent of stockholders (who are deemed to have dissented under Section 1126).[7A]

As to Class 3, the FmHA, they are to retain (or receive new) mortgages on all of their collateral after confirmation to secure repayment of their claim to the extent of their value of collateral. The company will be reorganized and stock will be issued to the unsecured creditors, including the unsecured portion of the FmHA claim. The "Reorganized Corporation" will issue a form of debt instrument (hereinafter termed "income bonds") to the FmHA which will be secured by collateral mortgages on the property of the Reorganized Corporation.

---

**7.** The FmHA is placed in Class 3 for purposes of voting, although they are treated (under the plan) the same as claims in Class 4 for the unsecured (undersecured) portion of their claim. Because their interests conflict with typical unsecured claims, they are classified separately for voting purposes. Hence, their separate classification is not arbitrary or unreasonable; and thus, it complies with 11 U.S.C. § 1122(a). As mandated by Section 1122(a), "a plan may place a claim ... in a particular class *only* if such claim ... is *substantially similar* to other claims ... in such class." The claim of the FmHA is clearly *not* substantially similar to other unsecured claims. Therefore, it must be classified separately.

**7A.** *See generally* Klee, "All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code," 53 *Am.Bankr.L.J.* 133 (1979) at pps. 164–167 [hereinafter cited as "*Klee*"].

■ The income bonds will also be retired out of future earnings and bear a cumulative interest/discount rate of 10% per annum.[7B] The income bonds will have a maturity date *no longer than fifteen years* after confirmation. The amortization of the bonds will be from one-half of the net profit earned by the reorganized corporation, with the balance of the net profit to be used as a contingent reserve or for repairs, replacement, preservation of assets, and other capital expenditures.[7C] If there arises a dispute over what constitutes "net profit" to retire these bonds, the Court retains jurisdiction over this matter to determine any dispute which the FmHA may have. The Court feels that the adjustments and modifications in the plan made by the trustee at confirmation insure that the FmHA is receiving "fair and equitable" treatment in accordance with Section 1129(b)(2)(A). Since the FmHA is retaining its lien on its present collateral and receiving deferred cash payments satisfying the entire allowed amount of its secured claim, it is receiving "fair and equitable" treatment under Section 1129(b); and the trustee's plan was confirmed over the dissent of the FmHA for these reasons.

■ As to Class 4, this is comprised of the unsecured claims of the debtor, including the undersecured portion of the FmHA claim. All of these unsecured claims will receive the stock of the reorganized corporation on a pro-rata basis; and the Reorganized Corporation will amend the charter of the debtor to authorize and provide for consummation of the plan. Because this class of creditors is receiving the residual value of the corporation, which is more than the liquidation value of the debtor, and since *no junior* claim or interest is receiving and retaining any property under the plan, this class is receiving fair and equitable treatment under Section 1129(b)(2)(B). Therefore, the Court confirmed this plan without the vote of this class of creditors.[7D]

## FINANCIAL CONCEPTS AND FEASIBILITY OF PLAN

■ The principal business decision in the trustee's plan is to achieve a restructuring of the capital/debt of the company so the operations may be continued in the future.[7E] He has already selected three proposed competent executive officers to begin operations immediately after confirmation (one to be Chief Executive Officer; one to be Vice-President in charge of sales; and one to be Vice-President in charge of operations).

■ Arguably, all of the debt might be converted to a stock position; but the trustee believes that the spirit of Chapter 11 is to retain the secured position of the FmHA, to the extent possible, in this proceeding.[8] However, because of an inability to accurately predict the company's ability to pay a future fixed debt charge, the trustee has chosen to give the FmHA under the plan a debt closely akin to "income bonds." The terms and conditions of this debt instrument will be approved by the Court to insure the fairness of this debt instrument given to the FmHA. Traditionally, income bonds have been issued in many reorganiza-

---

**7B.** The original interest/discount rate was 8%; but the rate was modified by the trustee on January 27 to 10%.

**7C.** The Reorganized Corporation must also have monies to pay taxes, unless net operating losses can be preserved (which is presently unknown).

**7D.** The record is not clear as to this class' vote; but no creditors in this class have objected. In fact, various creditors in this class appeared at prior confirmation hearings *in support of* the plan, and especially through John Crigler, an attorney representing several of these creditors.

**7E.** The trustee has proven (a) that the "going concern" value of the debtor is *far* greater than the "liquidation" value and (b) that continued profitable operations are "feasible" and appropriate. Thus, the continued operation and rehabilitation of the debtor appears to be mandated by law. *See, generally,* Blum, "The Law and Language of Corporate Reorganization, 17 *U.Chi.L.Rev.* 565 (1950).

**8.** *See, Klee, supra,* at p. 156; *see, also,* 124 *Cong.Rec.* H. 11,103 (daily ed. Sept. 28, 1978), at 11,104; 124 *Cong.Rec.* S. 17,420 (daily ed. Oct. 6, 1978), at S. 17,421.

tion proceedings for the purpose of giving a flexible debt instrument to make a plan of reorganization more feasible. *See, e.g., In re Georgian Hotel Corporation*, 82 F.2d 917 (7th Cir. 1936); *Warner Bros. Pictures v. Lawton-Byrne-Bruner Ins. A. Co.*, 79 F.2d 804 (8th Cir. 1935); *In re Philadelphia and Western Ry. Co.*, 51 F.Supp. 129 (E.D.Pa. 1943); *In re Gibson Hotels*, 24 F.Supp. 859 (S.D.W.Va.1938).[8A]

All of the above cited cases have upheld the issuance of income bonds in reorganizations, stating that "the evident purpose of making the income bonds is to remove the very menace of fixed charges which occasion the difficulties of the business resulting in reorganization." *Warner Bros. Pictures, supra,* at p. 818.

Essentially, this is the main method by which secured creditors may receive back as much as possible on their secured claims and still allow the debtor to have a "feasible" plan. As has been stated, a "plan is feasible if it does not provide for an excessive capital structure, if it gives the company a reasonable prospect for survival, and if the net earnings which the new company may reasonably anticipate over the indefinite future will be sufficient to meet the interest and dividend requirement of the new securities to be issued." *In re Philadelphia and Western Ry. Co., supra,* at p. 130.

Further, "[a]s there are no fixed interest and dividend requirements in the proposed plan for the reorganized company it may be taken that the last requirement of feasibility is met, and it follows that the plan gives the company a reasonable prospect for survival." *Id.* at p. 130.

In the *Philadelphia and Western Ry. Co.* case, the Court upheld the feasibility of a plan issuing income bonds over the objec-

tion of the Securities and Exchange Commission. *See* Blum & Kaplan, *Corporate Readjustments and Reorganization,* (1976) at pps. 680–689; *See, also, In re Waern Bldg. Corporation,* 145 F.2d 584 (7th Cir. 1944), *citing* the *Philadelphia and Western Ry. Co.* case with approval as to feasibility requirements.

## ANALYSIS OF MISCELLANEOUS PROVISIONS

The miscellaneous provisions basically allow the Court to retain jurisdiction to insure that the plan will be completed. The board of directors is proposed to be no less than five members, of which three (Gentry, Anderson, and Weitz) are specified in the plan and have special experience and knowledge of corporate finance, reorganization proceedings, and the rehabilitation of troubled companies. Another board representative would be the Chief Executive Officer of the Reorganized Corporation, which would provide some continuity of management with the board. The last board member would presumably be nominated by the FmHA in order to voice their concerns.[9]

Under the new Bankruptcy Code, Section 1129(a)(5) mandates that the proponent of the plan (the trustee in this case) disclose the identity and affiliations of any individual proposed to serve, after confirmation, as a director, officer, or voting trustee of the debtor; and further, this Section requires the identity of any insider to be employed or retained by or retained by the debtor and the nature of compensation to such insider. Finally, in regard to any director or officer, the appointment to or continuance in one of these offices by an individual must be consistent with the interests of creditors and equity security holders and with public policy. Section 1129(a)(5) is derived from Section 221(5) of old Chapter X.

---

**8A.** Recently, this Court confirmed a plan of reorganization which provided that unsecured creditors would be paid in full over 15 years, with interest at the rate of 10% per annum, from the net cash flow of a debtor. *See Johnnie Bayles Supply Company, Inc.,* United States Bankruptcy Court, Western District of Louisiana, Chapter 11 Case No. 580–00832–M. The

concept of that plan is analogous financially to the "income bond" concept in the instant case.

**9.** The trustee modified (at the January 27th confirmation hearing) the plan to provide that the FmHA may nominate two additional board members, if they so desire, thereby giving them the right to select three directors and increase the board to seven directors.

The Court takes note of the fact that, if the FmHA appoints or nominates directors, there may be an implicit assumption that their fidelity may be compromised. That is—will the FmHA's appointees on the board serve (a) the FmHA on one hand, or (b) the corporation and the other third-party creditors who are made stockholders on the other hand? The court does not know how the nominees for the board of directors of the FmHA would act. However, it is clear and obvious that their loyalty and independence in serving the reorganized corporation will be impaired. For this reason, it is obvious that, if the FmHA were allowed to nominate a majority of the board of directors, there would be created a conflict of interest detrimental to other creditors and the public at large.

■■ The logic of the above is clear and simple, that is—the Court has a duty to insure that the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from conflicts and the potential of post-reorganization litigation so as to serve *all* creditors and interested parties on an even and loyal basis. The fiduciary duties of the board members and officers to the reorganized corporation should not be hampered by conflicts of interest. The Court notes that the trustee has modified the plan to allow the FmHA to have as many directors as possible on the board of directors of the reorganized corporation, while at the same time not gaining control. Specifically, the trustee's Second Amended Plan provides for a board of seven directors, of which the FmHA would nominate three. The other four directors have been disclosed to the Court at the confirmation hearing, and as stated above and below, the court is satisfied with their qualifications under the considerations and criteria set forth above in this opinion. Therefore, and in conclusion, the trustee's plan of reorganization attempts to fulfill the mandate of law, which is to allow the FmHA as large a vote (or control) in the management and voting power of the reorganized corporation as possible, while insuring that the initial board will not be dominated by the FmHA

or their nominees during the formative year or two of the company and especially when the post-reorganization litigation will be in effect.

Applying all of these factors, weighing them together, and considering the law as set forth above, the gravity and weight of these factors, when coupled with the law, favors the proposed board members, who have the requisite criteria set forth above necessary to consummate and carry out the plan.

The trustee's proposed board of directors can reasonably and fairly represent the new stockholders. First, there is great experience on this board, and such experience is expressly needed in face of the disasterous conditions of this company and the long, hard consummation process which will be required. Secondly, the majority of the board would be represented by "disinterested" persons having no preconceived financial stake in the outcome. Their ability to fulfill fiduciary duties to all stockholders and parties will be increased by their independence; and they are proven fiduciaries who have fulfilled their roles as fiduciaries in other successful reorganization proceedings in this state. Their independence will further limit any potential conflicts of interest between creditors or stockholders after confirmation. Third, the FmHA has an obvious and irrevocable conflict of interest in the instant case, since they hold the largest secured claim against the estate, as well as being the largest stockholder under the plan. The conflict in serving their secured claim versus their stock interest militates against giving control in the *initial* board to them until *after* the consummation process and at the first meeting of stockholders. The board, under the trustee's plan, insures that the interests of all other creditors will be preserved and protected through the formative first year or two of the Reorganized Corporation. Fourth, the judgment of the FmHA in protecting its stake in this company has proven to be imperfect by its lack of action and failure to take proper procedure to protect its position as explained previously. Better judg-

ment is needed in the management of the debtor through the consummation process and until the debtor is initially on sound financial footing. Finally, and in conclusion, the plan presents the best means by which the trustee can comprise the board of directors who will serve the interests of all parties, who have sufficient knowledge and experience in financially-troubled businesses and reorganization law to serve all parties, and who are best able to insure consummation of the plan.

The Court notes that this initial board will only be constituted for a period of approximately one to two years, which will be the period after consummation. After the final decree is entered, the plan is consummated, and all stock and securities are issued under the plan, the Reorganized Corporation will begin having normal annual meetings of stockholders to elect new board members. Further, there does not presently exist a situation where proxy machinery will thwart any voting rights of the FmHA as a stockholder. Therefore, the FmHA can elect its own board members in the future, assuming that it maintains a stock position in the Reorganized Corporation sufficient to elect directors. Thus, there is a "fair and equitable" allocation of voting rights to the FmHA and other creditors.

## CONCLUSION

In conclusion, the Court reviewed an extensive letter of approximately eleven pages previously sent to the FmHA by counsel for the trustee which buttresses the basic business underpinnings for the plan of reorganization. A fair reading of this letter (which has been filed in the record herein), together with the disclosure statement, interim report, plan of reorganization, the evidence presented by the trustee, compel the Court to issue these findings of fact and conclusions of law, which determine that the plan of reorganization is both "fair and equitable" and "feasible." The preponderance of evidence presented by the trustee compels a judgment that, if the Court confirms the trustee's plan, as amended and modified [the Second Amended Plan], (a)

the debtor will be reorganized and rehabilitated and (b) creditors will make the fullest possible recovery. Therefore, these findings of fact and conclusions of law are made in support of the confirmation order entered in connection herewith.